```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND

RANDY L. GREENE                  *

          Plaintiff              *

     vs.                         *   CIVIL ACTION NO. MJG-13-0653

YRC, INC.                        *

          Defendant              *

*    *    *    *    *    *    *    *    *
```

MEMORANDUM AND ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT

The Court has before it Defendant's Motion for Summary Judgment [ECF No. 76], Plaintiff's Cross-Motion for Summary Judgment [ECF No. 81], and the materials submitted relating thereto. The Court has conducted a hearing and has had the benefit of the arguments of counsel.

I.   INTRODUCTION

Plaintiff Randy Greene ("Greene" or "Plaintiff") was employed as a truck driver for Defendant YRC, Inc.[1] ("YRC" or "Defendant") and its predecessor company from 2002 until the termination of his employment on October 26, 2012. In this case,[2] Greene sues YRC, asserting claims that his employment was

---

[1] YRC was formed in 2009 by the merger of Yellow Transportation and Roadway Express.

[2] Filed in the Circuit Court for Baltimore City and removed to this Court.

wrongfully terminated in violation of his rights under the Family Medical Leave Act, 29 U.S.C. § 2612 et seq. ("FMLA").[3]

The parties have filed cross-motions, each seeking summary judgment.

II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement: the Court may look at the evidence presented in regard to a motion for summary judgment through the non-movant's rose-colored glasses, but must view it realistically. After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991). Thus,

---

[3] Greene asserted, but voluntarily dismissed, claims based upon alleged racial discrimination.

in order to defeat a motion for summary judgment, "the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her." Mackey v. Shalala, 43 F. Supp. 2d 559, 564 (D. Md. 1999) (emphasis added).

"Cross motions for summary judgment 'do not automatically empower the court to dispense with the determination whether questions of material fact exist.'" Equal Rights Center v. Archstone Smith Trust, 603 F. Supp. 2d 814, 821 (D. Md. 2009) (quoting Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341, 349 (7th Cir. 1983)). Rather, the court must examine each party's motion separately and determine whether summary judgment is appropriate as to each under the Rule 56 standard. Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011). The court may grant summary judgment in favor of one party, deny both motions, or grant in part and deny in part each of the parties' motions. See Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

III. DISCUSSION

At times relevant hereto, Greene was employed as a truck driver for YRC, a company that transports freight, primarily via truck, throughout North America. Greene worked out of the YRC

3

dispatch center in Baltimore, Maryland ("the Baltimore Terminal").

In or about 2011, Greene began receiving treatment for chronic high blood pressure and high cholesterol, regularly taking blood pressure and cholesterol medications prescribed by his primary care physician, Dr. Brango.

1. Greene's Version of October 25-26, 2012[4]

At about 8 p.m.[5] on the evening of October 25, 2012, Greene received a call at his Brogue, Pennsylvania home[6] from an outbound supervisor.  The supervisor requested that he appear at the Baltimore Terminal at 1:00 a.m. on October 26 to receive a dispatch along his regular Baltimore to Charlotte route.  Greene was asleep at the time and was irritated to be awoken, but told the supervisor he would accept the dispatch.  Greene then called Gary Chapman ("Chapman") the Terminal Manager, complained that the call had awoken him and also claimed he was entitled to an additional 15 minutes' pay relating to trouble closing a trailer

---

[4] In the instant summary judgment context, the Court herein refers to Greene's version of the facts, recognizing that YRC does not fully agree with him.

[5] Greene testified at his deposition that the call was "four or five hours before I had to come to work" at 1 a.m.  Greene Dep. [ECF No. 76-3] at 109:3-5.  An email in the record refers to a statement by Greene that the outbound supervisor had called him at "2000" or 8 p.m.  See ECF No. 76-2 at 55.

[6] About an hour's drive from the Baltimore Terminal.

4

door.[7]  Chapman responded that he would speak to the supervisor who had awoken Greene, but that Greene was not entitled to the 15 minutes' pay.

Greene subsequently drove to the Baltimore Terminal, arriving around midnight.  He saw that Chapman was in the dispatch office and approached him to again raise the issue regarding the 15 minutes' pay.  Chapman refused to discuss the pay issue, at which point Greene accused Chapman of showing "hostility" toward him.

Greene was upset by this interaction with Chapman, experiencing chest pains, stomach pains, and shaking hands as a result.  He went outside to try to calm down while waiting for his dispatch, still experiencing the same symptoms.  At approximately 1:15 a.m., however, he accepted his dispatch, thereby becoming responsible for the freight load.

As Greene was hooking the trailer up to the truck, his symptoms worsened.  After completing the pre-trip inspection, he sat in the cab to try to calm down.  At that time, his "chest was hurting pretty badly," his "hands were shaking," he was

---

[7] Greene contended that he was due 15 minutes' additional pay related to problems closing the swing door on his trailer on October 20, 2012.  Greene's request was initially denied by Operations Manager Steve Bruhn, prompting Greene to submit a Payment Request Form to YRC management.  That request was also denied.  The parties have not provided the pertinent dates.

having trouble breathing, and he was unable to calm himself down.  He thought he might be having a heart attack.

Greene felt unable to drive his tractor-trailer all the way to North Carolina.  Wishing to notify a supervisor but feeling too ill to go in search of one, Greene asked a nearby coworker, John Reed ("Reed"), to inform Chapman that he was having chest pains and needed to leave.  Greene then left the truck and walked to his car, feeling disoriented, unsteady, and having trouble breathing.  He got into his car and began the drive back to his home in Pennsylvania, calling Chapman from the road to confirm that Reed had delivered the message that he had to leave on account of chest pains.

### 2. The Collective Bargaining Agreement

Greene's employment with YRC was governed by a Collective Bargaining Agreement ("the CBA"), which consisted of two documents: (1) the Teamsters National Master Freight Agreement and (2) the Maryland-District of Columbia Freight Counsel Supplemental Agreement (the "Local Agreement").  As pertinent hereto, the CBA provided that:

> (1) An employee may lose seniority as a result of a "voluntary quit."[8]  Article 53 Section 4(a)(8) of the Local Agreement [ECF No. 81-4] at 199.

---

[8]  The term "voluntary quit" is not defined in any portion of the CBA provided to the Court, and the parties do not seem to

6

    (2)    An employee shall receive a warning letter before being discharged for anything other than a "cardinal offense."  Article 45 Section 1(b) of the Local Agreement [ECF No. 81-4] at 178-81.

    (3)    For resolution of employment disputes, employees are authorized to file a grievance with regard thereto, pursuant to a process set forth in the CBA.[9]  See Chapman Decl. [ECF No. 76-2] at ¶¶ 17-21.

    3.    <u>The Discharge</u>

At 4:59 a.m. on October 26, 2012, Chapman sent an email to Labor Manager Gary Quinn recommending that Greene receive a discharge letter for a "voluntary quit," pursuant to Article 53 Section 4(a)(8) of the "Local Agreement," on account of Greene's failure to personally notify a supervisor before leaving sick.

Later that morning, Greene, unaware of Chapman's recommendation, contacted Dr. Brango and made an appointment for that same day at 1:15 p.m.  During that appointment, Dr. Brango found that Greene's blood pressure was elevated and wrote a note stating that Greene was having "health issues" and should be

---

agree on what the term means.  Plaintiff testified at his deposition that "a voluntary quit is when somebody just says I quit."  Greene Dep. [ECF No. 76-3] at 41:15-16.  YRC cites to the affidavit of Gary Chapman, who states that the term "is a term of art under the Contract.  Whereas a 'resignation' must be in writing signed by the employee, a 'voluntary quit' occurs through conduct or an unwritten communication."  Chapman Decl. [ECF No. 76-2] ¶ 24.

[9]  It appears that Article 45 Section 2 of the Local Agreement may set forth this process, but a complete copy of that section was not provided to the Court.  See ECF No. 81-4 at 181.

excused from work from October 26, 2012 until November 4, 2012, signing the form electronically at 1:43 p.m.  Greene faxed the note to YRC "at some point thereafter."  Def.'s Mem. [ECF No. 76-1] at 13.

Shortly after 4:00 p.m., Chapman notified Greene via telephone that his employment had been terminated by virtue of a "voluntary quit" related to the events of that morning.

On October 29, 2012, Greene filed a grievance challenging his discharge and the matter was referred to the Maryland-DC Joint Area Committee ("JAC").[10]  YRC raised a "point of order" to the JAC, stating that the grievance had been filed under the wrong provision of the CBA.[11]  Therefore, YRC argued, the grievance was not properly before the JAC.  The JAC agreed and dismissed the grievance.

---

[10] Pursuant to the CBA, when an employee files a grievance, local management schedules an informal meeting with the employee to attempt to resolve the grievance.  If that attempt is unsuccessful, the matter is resolved by the geographically relevant Joint Area Committee, comprised of panelists from YRC and the Union.  If either party is dissatisfied with the JAC's resolution of the dispute, that party can submit the matter to binding arbitration.  See Def.'s Mem. [ECF No. 76-1] at 4.

[11] Greene's grievance was filed under Article 43 Section 10, dealing with conflicts of interest, but Greene was terminated under Article 53 Section 4(a)(8).  However, this latter provision deals with loss of seniority, not discharge.  See ECF No. 81-4 at 199 ("Section 4.  Loss of Seniority (a) Seniority shall be broken only by: . . . (8) Voluntary Quit").

4. <u>The Interference Claim</u>

Pursuant to the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

It is unlawful for any employer to "interfere with, restrain, or deny the exercise or the attempt to exercise, any right provided under [the FMLA]." <u>Id.</u> § 2615(a)(1). To establish unlawful interference with FMLA rights, Greene must demonstrate that:

(1) he was an eligible employee,

(2) his employer was covered by the FMLA,

(3) he was entitled to leave under the FMLA,

(4) he gave his employer adequate notice of his intention to take leave [for a serious health condition], and

(5) the employer denied FMLA benefits to which he was entitled.

<u>Rodriguez v. Smithfield Packing Co., Inc.</u>, 545 F. Supp. 2d 508, 516 (D. Md. 2008); <u>Brushwood v. Wachovia Bank, N.A.</u>, 520 F. App'x 154, 157 (4th Cir. 2013) (noting the requirement of "notice of a serious health condition").

Because the Court finds there to be genuine issues of material fact presented regarding Greene's need to take FMLA

9

leave and the adequacy of notice given by Greene, neither party is entitled to summary judgment on Greene's interference claim.

### a. Need for FMLA Leave: Serious Health Condition

YRC concedes[12] that Greene's version of the facts, if accepted by the jury, could certainly support a finding that he was suffering from a serious health condition. That is, he felt terrible, didn't know if he was having a heart attack, and told a co-worker, Reed, to inform Chapman that he was having chest pains and needed to leave. Such notice, including an indication that Greene was experiencing chest pains, can be found sufficient to put YRC on inquiry notice that Greene may require FMLA leave. And, "[o]nce the employee has provided at least verbal notice of a serious health condition sufficient to alert the employer to the fact that the protections of the FMLA may apply, '[t]he employer should inquire further to ascertain whether it is FMLA leave that is being sought and to obtain further details of this leave.'" Brushwood, 520 F. App'x at 157 (quoting Rhoads v. FDIC, 257 F.3d 373, 383 (4th Cir. 2001)). Therefore, YRC is not entitled to summary judgment on the ground that Greene did not have a serious health condition.

---

[12] YRC has conceded, for purposes of its motion for summary judgment, that Greene suffered from a "'serious health condition' for which he may have been able to seek FMLA leave." Def.'s Mem. [ECF No. 76-1] at 19 n.5.

Nevertheless, YRC has presented evidence that, if viewed by a reasonable jury in the way YRC contends, could result in a finding that Greene left the job site for a reason other than a serious health condition, for example, due to anger.  The Court is by no means making a fact finding.  However, there is circumstantial evidence that could be viewed as contradicting Greene's position and supporting YRC's.  For example, Greene's not seeking immediate medical care — i.e., by going to an emergency room or calling 911 — and not seeking assistance from anyone, but driving an hour to his home; Greene's not seeking immediate medical care upon his arrival at home, but making an appointment for an office visit in the afternoon.

Moreover, the testimony of Reed – albeit somewhat internally inconsistent – can be viewed as supporting either YRC's or Greene's position.  Reed first said:

> And he [Greene] stopped out there and he said, "Look, I don't feel good.  I've got pains in my chest" and "Would you tell them."  And I said, "Sure.  I'll tell them," just like I explained in the note.

Reed Dep. [ECF NO. 76-4] at 14:4-8.

However, later in his deposition, he said:

> Q.  When Mr. Greene expressed to you that he was having some sort of physical problem, did you perceive that it was of a sufficient degree that it would prevent him from going into the terminal to speak with a supervisor?

>       A.  No.  I mean, I -- it wasn't like he was
>       going around like this with his chest pains.
>       So, I mean, I'm no physician to see how bad
>       of shape he's in.  So he just turned around
>       and left.
>
>       Q.  Did you -- did you ask him whether he
>       needed medical assistance?
>
>       A.  Well, I asked him if he was all right
>       (sic) and he says, "No.  I'm going to go
>       home" or "go to the doctor's."  And he says,
>       "And I'll return with a doctor's slip.  Just
>       tell them that."  So. . .

Id. at 34:3-17.

By virtue of factual issues presented regarding Greene's need for FMLA leave, Greene is not entitled to summary judgment with regard to the serious health condition issue.

### b. The Manner of Notice

YRC contends that, even if the content of Greene's notice is found to have been adequate, the notice was not properly given.

When, as in the instant case, the need for FMLA leave is unforeseeable, "an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.303(c).  YRC contends that Greene failed to comply with an alleged unwritten customary practice requiring notice to be given directly to a supervisor before an employee leaves work.

Therefore, YRC contends, Greene did not properly provide notice of a need for FMLA leave.

The evidence submitted presents a plethora of factual issues regarding this contention. Was there any usual and customary notice and procedural requirement for requesting leave? If so, precisely what was the requirement? Did Greene in fact comply, or comply to an adequate degree with that requirement?

In sum, the Court finds that genuine issues of material fact prevent summary judgment for either party with regard to this contention.

### 5. The Retaliation Claim

The rights afforded to employees under the FMLA include protection from retaliation for exercising their rights under the FMLA. See Dotson v. Pfizer, Inc., 558 F.3d 284, 294 (4th Cir. 2009). Although the FMLA does not explicitly refer to retaliation, the FMLA regulations state that the "prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). Specifically, the regulations state that "employers cannot use the taking of FMLA leave as a negative

factor in employment actions, such as hiring, promotions or disciplinary actions." Id.

### a. The Burden Shifting Framework

To succeed on an FMLA retaliation claim, a plaintiff must first "make a prima facie showing [1] that he engaged in protected activity, [2] that the employer took adverse action against him, and [3] that the adverse action was causally connected to the plaintiff's protected activity." Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 551 (4th Cir. 2006) (internal quotation marks omitted).

If the plaintiff makes a prima facie showing of retaliation, the burden shifts to the defendant to articulate a non-discriminatory basis for the adverse action. Id. at 550-51 ("FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green." (citation omitted)). If the defendant is able to offer such a non-discriminatory basis, the burden shifts back to the plaintiff to "establish[] that the employer's explanation is pretext for FMLA retaliation." Id. at 551.

14

### b.  Prima Facie Case

If his version of the facts is accepted, Greene would have made a prima facie showing adequate to avoid summary judgment. That is, a reasonable jury could find (1) that Greene sought to take FMLA leave, a protected activity, (2) that the employer took adverse action against him by terminating his employment and, (3) that the termination was caused by his engaging in the protected activity, attempting to take FMLA leave.

### c.  YRC's Non-retaliatory Justification

Because Greene can be found to have made a prima facie case, YRC must articulate a non-discriminatory justification for terminating Greene's employment. YRC has done so.

YRC offers, as its non-retaliatory reason for terminating Greene's employment, Greene's violation of its alleged notice policy and his voluntarily quitting his employment.

### d.  Pretext for Retaliation

Since YRC has articulated a non-retaliatory justification for terminating Greene's employment, Greene must establish that the justification is a pretext for retaliation.

To establish that an explanation for termination is a pretext for retaliation, a plaintiff must "show that as between [the request for FMLA leave] and the defendant's explanation,

15

[the request for FMLA leave] was the more likely reason for the dismissal, or that the employer's proffered explanation is simply 'unworthy of credence.'"  Burns v. AAF-McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted).

Both Greene and YRC make arguments regarding the reason for Greene's termination that, depending upon the jury's evaluation of the evidence, could warrant a verdict in their favor.

Greene, for example, asserts that YRC had never actually discharged a Baltimore employee for failure to notify a supervisor before leaving work.  Pl.'s Mot. [ECF No. 81] at 11, 13-17.  He contends that other YRC employees were not terminated despite having committed violations that, in Greene's view, were "more serious" than Greene's conduct.  Id. at 18-22.

Greene denies that he could have been terminated under the "voluntary quit" provision found in Article 53 Section 4(a)(8) of the Local Agreement because that section deals only with loss of seniority and not with discipline or termination.  Id. at 3. Greene asserts that discharge or suspension is governed by Article 45 of the Local Agreement and requires that an employee receive at least one warning letter before being terminated. Id.  Greene received none.

YRC contends that it is YRC's customary practice to issue "voluntary quit" discharge letters under Section 53 4(a)(8) of the Local Agreement to unit employees who have left work without

16

first notifying a supervisor. Def.'s Mem. [ECF No. 76-1] at 12.[13] Defendant identifies Brian Titus, Dean Detweiler, and Jay Bennett as three examples of employees who were issued discharge letters after walking off the jobsite.

Greene, however, contends that these examples are distinguishable, because those employees were ultimately discharged for other reasons and/or worked at a different YRC facility. See Pl.'s Mot. [ECF No. 81] at 13-16. Greene asserts (1) that Brian Titus had committed numerous other disciplinary violations[14] and was ultimately terminated for "recklessness resulting in a serious accident while on duty," approximately 18 months after he received a letter of discharge for failure to complete an assignment without notifying a supervisor, (2) that Dean Detweiler was terminated for failing to speak to management before leaving work with regard to an accident he was involved in, and (3) Jay Bennett apparently did give notice to a supervisor before going home sick, demonstrating that he was terminated for another reason. Furthermore, since neither

---

[13] The effect of such a letter, according to YRC's counsel, is to begin a grievance process that, through negotiation with the union, may result in discipline less than discharge. See Hearing Tr. [ECF No. 96] at 4:15-20.

[14] These violations included "an unprovoked assault during working hours," "insubordination and unprofessional conduct," "fail[ure] to complete a run," "fail[ure] to follow instructions," "excessive absences," "unexcused absence," tardiness on three occasions, and minor accidents. Pl.'s Mot. [ECF No. 81] at 14.

17

Detweiler nor Bennett worked at the Baltimore Terminal, they were represented by a different union and subject to a different collective bargaining agreement local supplement than the drivers at the Baltimore Terminal.

YRC, nevertheless, notes that Titus, Detweiler, Bennett, and Greene all received discharge letters for failing to notify a supervisor before leaving work and that Greene has not identified any instance where such a letter has not followed such a notification failure.

It is unnecessary to detail further the parties' contentions, responses, and replies.  There is no doubt that there are genuine issues of material fact preventing summary judgment for either side in regard to the reason for Greene's termination.

IV.  CONCLUSION

For the foregoing reasons:

1. Defendant YRC, Inc.'s Motion for Summary Judgment [ECF No. 76] is DENIED.

2. Plaintiff Randy Greene's Cross-Motion for Summary Judgment [ECF No. 81] is DENIED.

3. Plaintiff shall arrange a telephone conference regarding trial scheduling to be held by February 29, 2016.


SO ORDERED, this Friday, February 19, 2016.


                                                   /s/
                                    Marvin J. Garbis
                           United States District Judge